UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CAROL J. ASCHERMANN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | 1:10-cv-00433-LJM-MJD |
| | ) | |
| AETNA LIFE INSURANCE COMPANY, | ) | |
| LUMBERMENS MUTUAL CASUALTY | ) | |
| COMPANY, ASTRAZENECA LONG | ) | |
| TERM DISABILITY INSURANCE | ) | |
| PLAN, ASTRAZENECA RETIREE | ) | |
| HEALTH CARE PLAN, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Pending before the Court are the parties' cross-motions for summary judgment:

Motion for Summary Judgment by Defendant AstraZeneca Retiree Health Care Plan

("Medical Plan") [Dkt. No. 55]; plaintiff's, Carol Aschermann ("Plaintiff"), Motion for

Summary Judgment [Dkt. No. 57]; and Defendants' Motion for Summary Judgment [Dkt.

No. 61] filed by defendants Aetna Life Insurance Company ("Aetna"), Lumbermens Mutual

Casualty Company ("Lumbermens"), and the AstraZeneca Long Term Disability Insurance

Plan ("Disability Plan") (collectively, "Disability Defendants").  Plaintiff seeks recovery from

the Medical Plan for termination of medical coverage, and from the Disability Defendants

for termination of long term disability benefits, under the Employee Retirement Income

Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*  The Court has considered the

parties' arguments and rules as follows.[1]

---

[1] Contemporaneously with the cross-motions, Plaintiff filed a Request for Oral Argument [Dkt. No. 60].  The Court concludes that it has sufficient information to decide the cross-motions and, therefore, **DENIES** the Request for Oral Argument [dkt. no. 60].

## I.  BACKGROUND

This case comes before the Court with an extensive claim file.  *See generally* dkt. nos. 65–70.  All parties refer to pages in the claim file by Bates number.  For ease of discussion, all citations to the claim file in this Order will be designated as "R." followed by the Bates number for the page at issue.

From April 1997 until April 2003, Plaintiff was employed by AstraZeneca Pharmaceuticals ("AstraZeneca") as a Pharmaceutical Sales Representative.  Dkt. No. 14 ¶¶ 16, 17.  During her period of employment, Plaintiff was a participant in two employee benefit plans: the Medical Plan and the Disability Plan.  *Id.* ¶ 5; dkt. no. 25 ¶ 5.  The Disability Plan is insured by Lumbermens, while Aetna serves as the Disability Plan's third party administrator.  Dkt. No. 14 ¶¶ 6, 8.  Aetna receives no payment from either AstraZeneca or Lumbermens for administering the Disability Plan.  Dkt. No. 58-2 ¶ 7.

### A.  RELEVANT PLAN LANGUAGE

The Disability Plan provides the administrator may terminate benefits on "[t]he date [claimant] fail[s] to provide written proof of [the claimant's] Disability that we determine to be satisfactory."  R. 1184.  The Disability Plan defines "disability" as follows:

> Disabled/Disability means our determination that a significant change in physical or mental condition due to:
>
> 1.  Accidental injury;
> 2.  Sickness;
> 3.  Mental illness;
> 4.  Substance abuse; or
> 5.  Pregnancy,
>
> began on or after your Coverage Effective Date and prevents you from performing, during the Benefit Qualifying Period and the following 24 months,

2

the Essential Functions of your Regular Occupation or of a Reasonable Employment Option offered to you by the Employer, and as a result you are unable to earn more than 80% of your Pre-disability Monthly Income . . . .

After that, you must be so prevented from performing the Essential Functions of any Gainful Occupation that your training, education and experience would allow you to perform.

R. 1181.  The parties agree that Plaintiff's claim falls outside of the twenty-four months following the Benefit Qualifying Period ("'own occupation' period") and in the so-called "any occupation" period, which began for Plaintiff on October 27, 2005.  R. 3.

The Medical Plan provides that:

Former employees who were disabled after January 1, 2001 and are receiving disability payments from the AstraZeneca Long-Term Disability Plan on account of their disability are also eligible to participate in the [Medical] Plan until the earlier of age 65 or the date the disability benefit payments cease.

R. 2535.  The parties agree that Plaintiff is entitled to reinstatement under the Medical Plan only if the Court concludes that the Disability Defendants improperly terminated Plaintiff's benefits under the Disability Plan.  Dkt. No. 72 ¶ 3.


## B.  PLAINTIFF'S MEDICAL AND VOCATIONAL HISTORY

Plaintiff is a college graduate with a Bachelor of Science in Psychology and a Masters in Social Work.  R. 574.  From 1990 to 1995, Plaintiff was a clinical social worker.  R. 628.  Immediately prior to her employment at AstraZeneca, Plaintiff was a marketing manager for a schizophrenia rehabilitation program.  R. 575.  In her employment with AstraZeneca, Plaintiff's job responsibilities included promoting AstraZeneca products in doctor's offices, conducting dinner presentations, attending meetings, and recording information on her computer.  Dkt. No. 14 ¶ 17.  She was required to drive for long periods

of time and was responsible for meeting sales forecasts and budgets within her assigned territory.  R. 2211.  Pharmaceutical Sales Representative is classified as a "light" occupation by the *Dictionary of Occupational Titles* ("DOT"), although the parties disagree whether Plaintiff's work with AstraZeneca fully corresponds with the DOT definition.  R. 373, 2210.  In particular, Plaintiff represented to her doctors and the claims administrator that she was required to climb stairs, stoop, and complete other activities not specifically listed in the DOT as part of her job.  R. 373.  When Plaintiff left AstraZeneca on April 28, 2003, she was 36 years old.  R. 571.

Plaintiff was diagnosed with spondylolisthesis[2] at age 19, which progressed slowly and resulted in severe lower back pain.  R. 2227.  She underwent "extensive nonoperative treatment" in an attempt to relieve her back pain but was unable to achieve full pain relief. R. 2217.  By 2001, Plaintiff was experiencing significant back pain and right posterior buttock pain with radiation into her posterior thigh.  *Id.*

On October 4, 2001, Plaintiff had an MRI performed on her lumbar spine.  R. 2218. Plaintiff obtained an opinion from Dr. John Beghin, who recommended a decompression and fusion at L5-S1.  R. 2217.  On December 31, 2001, Plaintiff was referred to Dr. Rick Sasso ("Dr. Sasso") at Indianapolis Neurosurgical Group for evaluation and a second opinion on treatment.  *Id.*  In reviewing the October 2001 MRI, Dr. Sasso reported that Plaintiff had a large disc herniation at L5-S1, advanced degeneration at L4-L5, and spondylolisthesis at L5-S1.  R. 2218.  Dr. Sasso agreed with the previous opinion that a lumbar decompression and fusion would be a reasonable course of treatment.  *Id.*

---

[2] "Spondylolisthesis" is defined as "[f]orward movement of the body of one of the lower lumbar vertebrae on the vertebrae below it, or on the sacrum."  STEDMAN'S MEDICAL DICTIONARY 1812 (28th ed. 1995).

On February 11, 2002, Plaintiff returned to Dr. Sasso for continuing back and right leg pain, reporting that her pain was "1000 times worse" than it had been in December 2001.  R. 2219.  Dr. Sasso and Plaintiff discussed potential surgical options, and Plaintiff agreed to proceed with a Gill laminectomy[3] at L5 and a discectomy[4] at L5-S1 on the right with instrumentation and fusion at L5-S1.  *Id.*

On March 26, 2002, Dr. Sasso performed the lumbar fusion[5] surgery.  R. 2220. During the surgery, Dr. Sasso found profound compression of the bilateral L5 nerves, as well as significant disc herniation at L5-S1 and significant compression of the S1 nerve. R. 2224.  On March 29, 2002, three days after the surgery, Plaintiff was discharged, and she continued to follow up with Dr. Sasso.  R. 2222–24.

The surgery did not relieve Plaintiff's low back pain.  R. 2278–79.  On July 26, 2002, Plaintiff returned to AstraZeneca, but she was only able to work for approximately one month with her severe pain.  R. 2271.  On September 4, 2002, Dr. Sasso reported that Plaintiff had possibly developed pseudoarthrosis[6] at L5-S1.  R. 2280.  The following day, Plaintiff was approved for short term disability leave.  R. 2271.

In December 2002, Dr. Sasso referred Plaintiff to Dr. Dmitry Arbuck ("Dr. Arbuck") at Meridian Health Group, Inc. for pain management treatment.  R. 2227.  Dr. Arbuck

---

[3] "Laminectomy" is defined as "[e]xcusion of a vertebral lamina." STEDMAN'S MEDICAL DICTIONARY 1046 (28th ed. 1995).

[4] "Discectomy" is defined as "[e]xcusion, in part or whole, of an intervertebral disc." STEDMAN'S MEDICAL DICTIONARY 550 (28th ed. 1995).

[5] "Lumbar fusion" is defined as "an operative procedure to accomplish bony ankylosis between two or more vertebrae." STEDMAN'S MEDICAL DICTIONARY 780 (28th ed. 1995).

[6] "Pseudoarthosis" is defined as a "new, false joint arising at the site of an ununited fracture." STEDMAN'S MEDICAL DICTIONARY 1586, 1588 (28th ed. 1995).

recorded Plaintiff's pain history as follows:

> [S]tarted experiencing back pain at the age of 19. She was diagnosed with spondylolisthesis, which progressed slowly up to the point of severe pain and temporary disability. She had surgery in March 2002. It relieved her foot pain, but not the back pain . . . Average pain is a 7 out of 10, up to a 9 out of 10 periodically. Prolonged sitting and standing as well as walking more than 15 minutes or so makes the pain incapacitating. Holding any position for any length of time again makes it bad. Short sitting, rest in a supine position, heat and cold and short walks make it better. Stretching helps significantly. Massage helps. Lying down with her legs elevated is also helpful. The majority of her pain is in the low back, with periodic pain in the interscapular area. She has a history of epidural steroid injections, physical therapy and chiropractic adjustment. At times, pain is "horrible," most significantly distressing.

R. 2227. Dr. Arbuck developed a pain management plan for Plaintiff, including acupuncture and facet blocks. R. 2228. He changed her prescription medications, adding Neurontin, Zanaflex, and a Fentanyl patch. *Id.* He also started her on a home lumbar traction device. R. 2229.

Plaintiff began seeing Dr. Arbuck on a monthly basis for pain management. R. 2231–41. On January 6, 2003, Dr. Arbuck adjusted Plaintiff's medications. R. 2231. On January 20, 2003, Plaintiff again attempted to return to AstraZeneca. R. 2271. On March 6, 2003, Plaintiff reported an increase in back pain. R. 2234. Continued pain forced Plaintiff to stop working on April 28, 2003. *Id.* She has not worked since that date.

In light of her continued pain despite pharmacological intervention, Dr. Arbuck referred Plaintiff to Dr. Gary Wright ("Dr. Wright"), a pain management specialist and the Medical Director of Meridian Health Group. R. 2244. On June 16, 2003, Dr. Wright evaluated Plaintiff for diagnostic and therapeutic intervention. *Id.* Dr. Wright diagnosed

Plaintiff with sciatica,[7] lumbar facet syndrome, failed surgical back syndrome, sacroiliitis,[8] and lumbar segmental dysfunction.  R. 2245.  Dr. Wright recommended bilateral L2-3 through L5-S1 facet joint blocks and bilateral SIJ blocks.  *Id.*

In the summer of 2003, Plaintiff underwent facet injections and prolotherapy.[9]  R. 2250.  She continued to see Dr. Arbuck regularly for medication management.  R. 2246–61.

In June of 2003, Plaintiff had a functional capacity evaluation with physical therapist Michelle Martin.  This evaluation indicated that Plaintiff "is able to perform per job description" but could only carry fifteen pounds one-handed.  R. 372.  In response to this evaluation, Dr. Arbuck submitted a letter stating:

> Even with accommodations for carrying 15 pounds or less, it is unlikely that [Plaintiff] will be able to perform her job.  Specifically, it will be impossible for her presently, even carrying no weight, to climb the stairs and be involved in frequent bending, stooping, twisting, and repetitive motions.  With proper rehab, [Plaintiff] still has a chance of improving her function enough to go back to work, though a weight limitation likely will remain.

R. 373.

On September 23, 2003, Plaintiff applied for long term disability benefits under the Disability Plan.  R. 2213.  As part of her application, Plaintiff provided an Attending Physician Statement from Dr. Arbuck.  R. 2215–16.  Dr. Arbuck advised that Plaintiff had

---

[7] "Sciatica" is defined as "[p]ain in the lower back and hip radiating down the back of the thigh into the leg . . . known to usually be due to herniated lumbar disk compressing a nerve root, most commonly the L5 or S1 root." STEDMAN'S MEDICAL DICTIONARY 1731 (28th ed. 1995).

[8] "Sacroiliitis" is defined as "[i]nflammation of the sacroiliac joint." STEDMAN'S MEDICAL DICTIONARY 1714 (28th ed. 1995).

[9] "Prolotherapy" is defined as the "[u]se of inflammation-inducing injections in periarticular soft tissue intended to strengthen ligaments and tendons." STEDMAN'S MEDICAL DICTIONARY 1573 (28th ed. 1995).

constant back pain that had increased since 2001. *Id.* He marked a box characterizing Plaintiff as "marked limitation of functional capacity/capable of sedentary work" and reported her prognosis as "questionable." *Id.*

On November 10, 2003, Plaintiff's claim for long term disability benefits was denied. R. 2287–91. On January 22, 2004, Plaintiff appealed the denial of benefits, providing additional statements from both treating and consulting physicians. R. 2292–300. Included in these materials were two letters from Dr. Arbuck. In a letter dated November 21, 2003, Dr. Arbuck stated, "[Plaintiff] is disabled presently from my standpoint and her pain is marginally controlled. The medications add to her disability but must be provided due to the intractable[10] pain [Plaintiff] suffers otherwise." R. 387. In a second letter dated November 24, 2003, Dr. Arbuck stated, "[Plaintiff's] pain is constant and increases with any physical exertion. [Plaintiff] requires chronic ongoing pain management." R. 389.

Plaintiff also provided a statement from Dr. Sasso. R. 399. Dr. Sasso stated that Plaintiff has pseudoarthrosis at L5-S1. *Id.* A discography performed on January 2, 2004, was positive with 10/10 concordant pain. *Id.* Dr. Sasso opined that Plaintiff's present pain rendered her "functionally incapacitated." *Id.* In light of the additional documentation, on May 4, 2004, Broadspire[11] approved Plaintiff's claim for long term disability benefits through the appeals process, retroactively paying from October 26, 2003 and subsequent monthly payments. R. 401–02.

On June 22, 2004, Plaintiff had a lumbar discography and a lumbar spine CT scan,

---

[10] "Intractable" is defined as "resistant to treatment." STEDMAN'S MEDICAL DICTIONARY 993, 1664.

[11] Aetna purchased Broadspire Services, Inc.'s disability operations effective April 1, 2006. Dkt. 29 at 4. Aetna administers Lumbermens' open disability claims as a result of this purchase. *Id.* The parties agree that, while Broadspire made the decision as to Plaintiff's long term disability claim in 2004, Aetna made the 2009 decision at issue in this case.

which revealed a large posterior annular tear.  R. 2158–61.  A CT scan without contrast revealed advanced disc degeneration at L4-5 status post posterior spinal fusion and moderate left facet joint degeneration with facet joint widening at L4-5.  R. 2163–64.  On June 30, 2004, orthopedic surgeon Dr. Terry Trammell ("Dr. Trammell") reviewed the discography and CT scans.  R. 2158.  Dr. Trammell recommended a second spine surgery consisting of a L4-5 and L5-S1 anterior fusion followed by posterior reinstrumentation and fusion.  *Id.*  With regard to Plaintiff's prognosis from this surgery, Dr. Trammell stated:

> Whether or not this [surgery] would give her significant pain relief is indeterminate.  I certainly would not expect her to get more than 50% relief of her complaints of back pain.  I would anticipate that she is going to have back pain of chronicity, and whether or not we are able to lessen by this surgical procedure is speculative.

*Id.*

On November 2, 2004, Dr. Trammell performed an L4-5 and L5-S1 lumbar fusion and insertion of intervertebral prosthetic devices on Plaintiff.  R. 423.  This surgery was in part meant to correct the non-union of the previous attempted posterior fusion by Dr. Sasso.  *Id.* at 437.  Two days later, Dr. Trammell completed an Attending Physician Statement advising that Plaintiff was to be off work.  R. 2154.

On April 25, 2005, Plaintiff had a follow up appointment with Dr. Trammell.  Plaintiff reported that she was twenty percent better than she had been pre-operatively and had no leg pain or paresthesias.  R. 559.  However, she still reported some back pain, although she classified it as mild to moderate pain.  *Id.*

On July 13, 2005, Dr. Arbuck provided a statement to Broadspire noting Plaintiff's diagnoses, including "recurrent major depression."  R. 568.  He stated, "Her condition is chronic and not relieved by surgery, injections, physical therapy or medications.  Her pain

is chronic and intractable and prevents her from gainful employment in her occupation.  Her

condition is not expected to improve unless new treatment options become available."  *Id.*

Plaintiff continued treatment with Dr. Arbuck throughout 2005 and 2006.  R. 537–55,

591–622.  After Aetna assumed administration of Plaintiff's claim from Broadspire, on

September 28, 2006, Dr. Arbuck wrote Aetna a letter regarding Plaintiff's condition:

> . . . [Plaintiff] demonstrated resistant treatment course and intractable back
> pain.  Her pain and function are poorly controlled. . . .
>
> She continues to exhibit significant sedation, fatigue, nausea, dizziness and
> mental cloudiness due to the medications and functional impairment with
> limitation in ability to move and be upright for sufficient periods of time. . . .
> [S]he has difficulty even sitting for longer than 20 to 30 minutes at a time.
> She needs to be in a reclined position for most of the day and any upright
> posture, including sitting, exacerbates pain and causes increase in pain level
> to uncontrollable degree.
>
> [Plaintiff]'s illness is chronic in nature and not expected to improve until new
> advances in surgical and instrumentation treatment are available.  I will
> continue to adjust her medications, but with little hope for good symptom
> control, rather trying to minimize pain medication side effects.

R. 643–44.  On November 13, 2006, Dr. Arbuck indicated in an Attending Physician

Statement that Plaintiff was unable to work.  R. 652.

Throughout 2007 and 2008, Lumbermens continued paying Plaintiff's long term

disability benefits.  R. 12–20, 31.  Benefits continued to be approved throughout that time

period, although Aetna contends that this approval was not on the basis that Plaintiff was

disabled under the Disability Plan.  *See* dkt. no. 76 at 3.  Instead, Aetna contends this

approval was allowed to continue while her disability status was investigated.  *Id.*

Dr. Arbuck continued to treat Plaintiff for pain management.  R. 660–69.  On June

25, 2008, Dr. Arbuck completed an Attending Physician Statement opining that Plaintiff

could not work.  R. 667.

10

In early 2009, Plaintiff provided Aetna with a Resource Questionnaire.  R. 670–72. Plaintiff reported that despite her treatments, including medications and two surgeries, she continued to have daily pain.  R. 672.  On March 12, 2009, Dr. Arbuck completed another Attending Physician Statement stating that Plaintiff has "No ability to work.  Severe limitation of functional capacity; incapable of minimal activity."  R. 683.  Dr. Arbuck further stated that Plaintiff's estimated date of return to work was "undetermined."  *Id.*  The claim note from the same date addresses Plaintiff's medication regimen, noting that she was "tolerating well" and "nausea [is] controlled."  R. 687.  Plaintiff continued treatment with Dr. Arbuck throughout 2009.  R. 685–94.

## C.  AETNA'S RECORD REVIEWS

At various times throughout its evaluation of Plaintiff's claim for disability benefits, Aetna and its predecessors consulted independent physicians and employability experts for a peer review of Plaintiff's file and evaluation of her disability status.  These reviews began during the "own occupation" period and continued through the "any occupation" period.  Although Plaintiff's claim file was presented to the peer reviewing physicians for review, none of the peer reviewing physicians directly examined or observed Plaintiff.

In mid 2003, an initial peer review of Plaintiff's claim file was completed by Dr. Alan Gruskin ("Dr. Gruskin"), a specialist in physical medicine and rehabilitation.  *See* R. 263–65. In his review, Dr. Gruskin noted that Plaintiff's neurological examinations had been normal and her orthopedic exams revealed only mild tenderness and pain at the low back with extreme motion.  *Id.*  Dr. Gruskin opined that Plaintiff was not disabled from her own occupation as a Pharmaceutical Sales Representative.  *Id.*  Dr. Gruskin's peer review was

used in the November 2003 denial of Plaintiff's benefits, but this denial was overturned during the internal appeals process.

Following Plaintiff's appeal of the November 2003 denial of benefits, two more peer reviews were obtained from Dr. Ira Posner ("Dr. Posner") and Dr. Sheldon Myerson ("Dr. Myerson").   On May 3, 2004, Dr. Posner, a specialist in orthopedic surgery and pain management, opined that Plaintiff was disabled from her own occupation based on "the limitations in terms of her ability to sit or stand for any length of time as well as her decreased ability to change positions, all of which would be required by a pharmaceutical sales representative."  R. 268.  However, he further opined, "She would be capable of sedentary-type work activity as long as she was able to change positions as needed.  Once she has had additional surgery in the lumbar spine and achieved a stable fusion at L5-S1, then she should be able to return to her occupational [sic] as a pharmaceutical sales representative."  *Id.*  Dr. Meyerson, a neurosurgeon, concurred that in May of 2004, Plaintiff was disabled from her own occupation.  R. 270–72.

In October of 2005, under the terms of the Disability Plan, Plaintiff's claim became subject to the "any occupation" standard.  R. 3.  Plaintiff's claim file was given to Dr. Martin G. Mendelsohn ("Dr. Mendelsohn"), an orthopedic surgeon.  *See* R. 273–75.  In a report dated October 18, 2005, Dr. Mendelsohn opined that "a functional impairment that would preclude the claimant from 'any occupation' cannot be substantiated" due to the lack of a "comprehensive examination with objective clinical findings" and lack of documentation from the pain management group.  R. 275.  Dr. Mendelsohn concluded that Plaintiff could engage in work "of a sedentary or light physical exertion level with the ability to change positions as needed."  *Id.*  Dr. Mendelsohn's report is not dated or signed, and the report

12

indicates that Dr. Mendelsohn received the referral from Aetna and dictated the report on the same date.  R. 273, 275.  Although notes in the claim file raise a question as to whether Aetna had Dr. Mendelsohn's report in the claim file in August of 2009, *see* R. 65, Dr. Mendelsohn's report was in the claim file at the time of appeal.

Following Dr. Mendelsohn's report, on May 5, 2006, the Disability Plan obtained an Employability Assessment Report to determine whether there were available positions within fifty miles of Plaintiff's home consistent with Plaintiff's education, experience, and work restrictions  that paid at least sixty percent of Plaintiff's pre-disability monthly income. R. 695–99.  The report identified three positions—social welfare administrator, medical social worker, and employee relations specialist—classified as sedentary and meeting the requirements for location, pay, and skills possessed by Plaintiff.  R. 698–99.  The report concluded that Plaintiff was employable based on a sedentary work classification.  R. 699.

On November 22, 2006, Plaintiff's claim file was reviewed by Dr. Lawrence Blumberg ("Dr. Blumberg"), an orthopedic surgeon.  R. 276–78.  Like Dr. Mendelsohn's report, the notes in the claim file raise a question as to whether Aetna had Dr. Blumberg's report in the claim file in August of 2009, *see* R. 65, although Dr. Blumberg's report was in the claim file at the time of appeal.  Dr. Blumberg concluded that Plaintiff's was not disabled under the "any occupation" standard, noting that "[t]here is no evidence that the claimant cannot sit . . . [or] use her upper extremities."  R. 277.  Dr. Blumberg suggested that Plaintiff would be restricted from "lifting over 70 pounds on [a] repetitive basis."  *Id.*  Although Dr. Blumberg noted that Plaintiff takes Ambien to sleep, he concluded that the drug would not affect Plaintiff's ability to work.  *Id.*

In early 2009, Plaintiff's claim file was submitted to Dr. Anthony Riso ("Dr. Riso"), a

13

Board Certified specialist in anethesiology and pain management.  *See* R. 279–82.  In a report dated January 20, 2009, Dr. Riso concluded that Plaintiff was not disabled under the "any occupation" standard, although he noted that she would be restricted to sedentary work.  R. 281.  Dr. Riso stated that during a peer-to-peer consultation, Dr. Arbuck "stated that the claimant would be capable of performing sedentary work as long as she did not have to lift, bend, stoop or squat."  R. 280.  Specifically discussing potential adverse medication effects, Dr. Riso further stated that "[n]o adverse medication effect is noted." R. 281.

On June 23, 2009, Aetna obtained a second Employability Assessment Report.  R. 701–05.  Rachel Lopez, the author of the report, spoke with Plaintiff and noted Plaintiff's statement that "sitting down too long causes problems for her . . . as does standing and walking," as well Plaintiff's concern that "[s]he has issues with concentration, she believes, due to the medication."  R. 702.  Ms. Lopez concluded that Plaintiff had skills transferrable to occupations such as public relations representative, provider relations representative, and caseworker, all of which are sedentary occupations.  R. 704.  On July 1, 2009, Ms. Lopez conducted a Labor Market Survey, concluding, "[t]o enter an occupation meeting the physical and wage requirements and matching [Plaintiff's] current abilities appears to be feasible[.]" R. 711.

14

### D.  TERMINATION OF PLAINTIFF'S BENEFITS AND APPEAL

On August 31, 2009, an Aetna representative contacted Plaintiff and informed her that her long term disability benefits were being terminated.  R. 48.  The representative stated that the termination was due to the peer-to-peer phone conversation between Dr. Riso and Dr. Arbuck, during which Dr. Arbuck allegedly stated that Plaintiff was capable of sedentary work.  R. 48, 178.  Plaintiff was scheduled for an appointment with Dr. Arbuck on September 1, 2009, and requested one day to speak with Dr. Arbuck and correct the error before termination.  R. 178.  Aetna informed Plaintiff of the appeal process and terminated her benefits.  R. 48, 178.

Aetna provided written correspondence explaining its termination decision.  R. 176–78.  In that correspondence, Aetna reiterated its interpretation of the peer-to-peer conversation with Dr. Arbuck, stating, "Dr. Arbuck stated that you would be capable of performing sedentary work as long as you did not have to lift, bend, stoop or squat."  R. 177.  There was no recording or written confirmation from Dr. Arbuck of the peer-to-peer consultation.  *Id.*  Additionally, although Aetna listed a number of documents "included" in its review of Plaintiff's claim, that list did not include the most recent Attending Physician Statements from Dr. Arbuck.  R. 176–77.  The letter stated that Plaintiff could provide updated documentation for the appeal that "includes medical data such as: diagnostic test results to support the diagnosis and claim for continued disability; and provides specific functional abilities, including any and all restrictions and limitations."  *Id.*

On September 1, 2009, a human resources representative from AstraZeneca contacted Aetna for an explanation as to termination of Plaintiff's benefits.  R. 48.  Aetna once again reiterated its stance that Dr. Arbuck approved of Plaintiff engaging in sedentary

work. *Id.* That same day, Dr. Arbuck wrote a letter to Aetna clarifying his position:

> To clearly state my opinion, I think that [Plaintiff] cannot work productively in any regular full time job environment, regardless of the nature of the job. She cannot work for more than maximum four (4) hours a day, no more than half an hour without a break. The only way she can function is if she has frequent breaks with the ability to recline. She will never be able to regain her function to work full-time and due to her present condition, I can with reasonable medical certainty say that four (4) hours of daily sedentary work with frequent breaks is the most she will be able to tolerate. I had a conversation with your physician reviewer about nine (9) months ago, in January of 2009. I do not remember the conversation clearly, but it seems that my statements were interpreted as reflecting an opinion that [Plaintiff] can work FULL time. Indeed the intended message is: [Plaintiff] can have PART time, no more than 4 hours a day sedentary job allowing frequent breaks. She will never be able to tolerate full time job of any sorts.

R. 694.

On September 3, 2009, Plaintiff appealed Aetna's termination of benefits. R. 178–79. In conjunction with her appeal letter, Plaintiff provided Aetna with Dr. Arbuck's September 1, 2009 letter, as well as Attending Physician Statements dated March 12, 2009 and June 25, 2008. *Id.* On September 11, 2009, Aetna confirmed receipt of Plaintiff's appeal and advised that she would be notified within forty-five days of Aetna's determination. R. 180.

Plaintiff contacted Aetna a number of times inquiring about the status of her appeal. *See* R. 50, 54, 62, 64, 68, 75. On October 5, 2009, following contact from Plaintiff, Aetna informed Plaintiff that appeal would likely take longer than originally anticipated because her claim file was missing the reports from Dr. Riso and Dr. Blumberg. R. 64. Plaintiff was further informed that if she wished to submit additional information, "the entire review will be restarted to include any new information that she sends." *Id.*

On October 14, 2009, Plaintiff contacted Aetna regarding a statement in one of the

16

peer reports that "[n]o adverse medication side effect is noted."  R. 68, 281.  Plaintiff advised Aetna that she had nausea due to her medications, and Aetna told Plaintiff that she could provide a statement to that effect, but any such statement would serve as an "addendum" restarting the appeal process.  R. 68.  Plaintiff declined to provide the statement.  On October 16, 2009, Aetna sent Plaintiff a letter indicating that a forty-five day extension of time was needed for the review of her appeal.  R. 183.

Following Plaintiff's appeal, Aetna requested two additional record reviews.  On October 23, 2009, Dr. Ephraim Brenman ("Dr. Brenman"), a specialist in physical medicine and rehabilitation, submitted a report finding Plaintiff not to be disabled under the "any occupation" standard.  R. 283–91.  Dr. Brenman stated, "The claimant has many subjective complaints that are not substantiated in the record."  R. 291.  Dr. Brenman contacted Dr. Arbuck for a peer-to-peer consultation and noted:

> [Dr. Arbuck] stated the patient would require a break for about a minute or two every 30–60 minutes.  He stated that the patient can work at home or do computer work, but the patient can only work four hours a day, not eight hours a day, due to the patient's medical condition and medications.

R. 290.  Pointing to the "lack of objective findings to support the claimant's ongoing self-reported symptoms," Dr. Brenman rejected the limitations outlined by Dr. Arbuck and concluded that Plaintiff "is not restricted from any occupational capacity.  She can engage in physical activities such as sitting, standing, walking, reaching, lifting, carrying and performing repetitive and fine motor hand motions without any physical restrictions and/or limitations."  R. 290–91.  Dr. Brenman also concluded that the claim file did not support "any adverse medication effect that impacts the claimant's work ability[.]" R. 291.

On November 11, 2009, Dr. Leonard Schnur ("Dr. Schnur"), a specialist in clinical

psychology, submitted a report addressing Plaintiff's potential disability based on psychological impairment.  R. 293–99.  Dr. Schnur noted that "Dr. Arbuck did reference the presence of mild depression, anxiety, and irritability."  R. 298.  However, he further noted that "there were no specific measurements to document a functional impairment across cognitive, emotional, and behavioral spheres."  *Id.*  Dr. Schnur concluded that no psychological impairment rendered Plaintiff disabled under the "any occupation" standard. R. 298–99.

On December 1, 2009, Aetna notified Plaintiff that the appeal committee upheld the original determination to terminate her disability benefits "due to a lack of medical and/or psychological findings to support [her] inability to perform the essential functions of any gainful employment."  R. 75, 162–63.

On December 4, 2009, Plaintiff contacted Aetna to discuss the appeal, and Aetna returned her call four days later.  R. 80.  Plaintiff asked why the documentation that had supported her claim since 2003 was no longer sufficient, and Aetna responded that "the entire claim file was reviewed" during the appeal review.  *Id.*  Plaintiff requested all documentation and notes related to her appeal, which Aetna provided.  R. 150, 158. Plaintiff contends that this was the first time Aetna provided her with copies of the peer record reviews used to deny her claim, although Aetna denies that this is the case.  Dkt. No. 58 at 27; dkt. no. 76 at 4.

On March 18, 2010, after obtaining legal counsel, Plaintiff submitted to Aetna the results of an Independent Medical Examination conducted by Dr. Daniel Brown ("Dr. Brown").  R. 110–32.  Dr. Brown concluded that Plaintiff "is permanently disabled from any meaningful employment. . . . [She] would not pass a single physical test which I have

18

performed for any of the occupations which range from sedentary to physically strenuous."

R. 112–13.  Dr. Brown also questioned the opinions of Aetna's record reviewing physicians.

R. 113–15.  On April 8, 2010, Aetna confirmed receipt of Dr. Brown's report but refused to

consider it, stating that Plaintiff already had exhausted her appeal.  R. 106–07.

As a result of Plaintiff's termination under the Disability Plan, the Medical Plan

terminated Plaintiff's coverage on February 1, 2010.  *See* dkt. no. 58 at 31; dkt. no. 76 at

6.  Beginning that date, Plaintiff paid premiums under COBRA to continue her coverage

under the Medical Plan.  Dkt. No. 72 ¶ 1.  On July 31, 2011, Plaintiff's COBRA coverage

ceased.  *Id.*

The Court includes additional facts below as necessary.


## II.  SUMMARY JUDGMENT STANDARD

As stated by the Supreme Court, summary judgment is not a disfavored procedural

shortcut, but rather is an integral part of the federal rules as a whole, which are designed

to secure the just, speedy, and inexpensive determination of every action.  *See Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also United Ass'n of Black Landscapers v.*

*City of Milwaukee*, 916 F.2d 1261, 1267–68 (7th Cir. 1990).  Motions for summary

judgment are governed by Federal Rule of Civil Procedure 56(a), which provides in relevant

part:

> The court shall grant summary judgment if the movant shows that there is no
> genuine dispute as to any material fact and the movant is entitled to
> judgment as a matter of law.

Once a party has made a properly-supported motion for summary judgment, the opposing

party may not simply rest upon the pleadings but must instead submit evidentiary materials

19

showing that a material fact is genuinely disputed.  FED. R. CIV. P. 56(c)(1).  A genuine dispute of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The nonmoving party bears the burden of demonstrating that such a genuine dispute of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir. 1996).  It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying applicable evidence.  *See Bombard v. Ft. Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party.  *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996).  The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment.  *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996).  Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute.  *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992).  If the moving party does not have the ultimate burden of proof on a claim, it is sufficient for the moving party to direct the court to the lack of evidence as to an element of that claim.  *See Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 & n.3 (7th Cir. 1994).  "If the nonmoving party fails to establish the existence of an element essential to [her] case, one on which [she] would

bear the burden of proof at trial, summary judgment must be granted to the moving party."

*Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996).

## III.  DISCUSSION

### A.  ADMISSIBILITY OF DR. BROWN'S REPORT

Before examining Aetna's actions in terminating Plaintiff's disability benefits, the Court must address the admissibility of Dr. Brown's report.  *See* R. 110–32.  The parties agree that Dr. Brown's report was provided to Aetna in March of 2010, after Aetna had denied Plaintiff's claim and the subsequent appeal.  *See* R. 108–32.  Aetna refused to consider Dr. Brown's report, stated that Plaintiff had exhausted her appeal procedures.  R. 106–07.  Plaintiff contends that Dr. Brown's report should be considered by the Court because it was provided to Aetna well in advance of litigation, giving Aetna ample time to consider it.  Dkt. No. 58 at 51–52.  Aetna contends that because Dr. Brown's report was provided after Plaintiff exhausted its appeal procedure, and ERISA regulations require the opportunity for only a single appeal of a denial of benefits, Aetna was not required to consider Dr. Brown's report, and the Court should disregard it as outside the claim file.  Dkt. No. 76 at 15.

Plaintiff has cited numerous cases in other jurisdictions finding that post-appeal evidence may be considered by a reviewing court when it was provided to the plan administrator with "a fair opportunity to consider it."  Dkt. No. 56 at 51–52 (collecting cases).  However, the Seventh Circuit has found that plan administrators are not required to reopen closed appeals "simply so that the reviewing court has a more complete record[.]"  *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 483 (7th Cir. 2009).  Under arbitrary and capricious

21

review, the Court's review is limited to the administrative record. *Krolnik v. Prudential Ins. Co. of Am.*, 570 F.3d 841, 843 (7th Cir. 2009). Therefore, because Dr. Brown's report was submitted after the administrative record was closed, Aetna was not required to consider it, and the Court may not consider it in evaluating Aetna's review of Plaintiff's claim. *Cf. Majeski*, 590 F.3d at 483.

## B. TERMINATION OF DISABILITY BENEFITS[12]

In an Order dated November 12, 2010, the Court determined that Lumbermens properly delegated discretionary authority to evaluate claims to Aetna in accordance with the Disability Plan. *See* dkt. no. 40 at 6. Therefore, Aetna's termination of Plaintiff's benefits is to be evaluated under the arbitrary and capricious standard of review. *See id.*; *see also Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 860–61 (7th Cir. 2009). For ERISA purposes, "the arbitrary-and-capricious standard . . . is synonymous with abuse of discretion." *Raybourne v. Cigna Life Ins. Co. of N.Y.*, 576 F.3d 444, 449 (7th Cir. 2009). Arbitrary and capricious review "turns on whether the plan administrator communicated 'specific reasons' for its determination to the claimant, whether the plan administrator afforded the claimant 'an opportunity for full and fair review,' and 'whether there is an absence of reasoning to support the plan administrator's determination.'" *Majeski*, 590 F.3d at 484. Arbitrary and capricious review "is not a rubber stamp," and the Court "will not uphold a termination when there is an absence of reasoning in the record to support it." *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir.

---

[12] Plaintiff's challenge of Aetna's decision is limited to her back pain and related conditions, as Plaintiff does not challenge Aetna's decision that Plaintiff has no psychological impairment rendering her disabled. Dkt. No. 58 at 33 n.12.

2010) (quoting *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 774–75 (7th Cir. 2003)).   However, termination will be upheld when "(1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of the relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem." *Sisto v. Ameritech Sickness & Accident Disability Benefit Plan*, 429 F.3d 698, 700 (7th Cir. 2005).

Plaintiff presents several arguments to the Court as to why Aetna's decision should be overturned.  Specifically, she contends that Aetna operated under a conflict of interest, ratified her right to receive benefits under the "any occupation" standard, and failed to accord Dr. Arbuck's opinion proper weight.  The Court will address each argument in turn.

Plaintiff asserts that Aetna has a conflict of interest that encourages it to terminate long term disability claims such as hers.  Courts "will presume that a fiduciary is acting neutrally unless a claimant shows by providing specific evidence of actual bias that there is a significant conflict." *Mers v. Marriott Int'l Grp. Accidental Death & Dismemberment Plan*, 144 F.3d 1014, 1020 (7th Cir. 1998).  In ERISA cases evaluating a plan's disability determination, conflicts of interest are "weighed as a factor in determining whether there is an abuse of discretion." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008). Typically, a conflict of interest arises when a plan administrator has both the discretionary authority to determine eligibility for benefits and the obligation to pay benefits when due. *See, e.g.*, *Jenkins*, 564 F.3d at 861.  However, in this case, it is undisputed that Aetna has the discretionary authority to determine eligibility, while Lumbermens is responsible for paying benefits.  Compl. ¶¶ 6, 8; *see also* dkt. no. 58-2 ¶ 7.  Therefore, this case does not

23

present a typical conflict of interest scenario.

Regardless, Plaintiff contends that a conflict of interest exists.  Specifically, Plaintiff asserts that Aetna operates under a conflict of interest because it receives no compensation for administering Plaintiff's claim while continuing to incur administration expenses related to the claim.  Dkt. No. 73 at 24 (citing dkt. no. 59 at 15).  However, more evidence than a "theory of an inherent conflict" is necessary for the Court to conclude that a conflict of interest exists.  *Mers*, 144 F.3d at 1020.  Plaintiff has not presented any evidence that Aetna treats the claims purchased under its agreement with Lumbermens—including her claim—any differently than claims for which it receives compensation.  Although the Court recognizes the potential for conflicts of interest in ERISA cases generally, the Court concludes that a conflict of interest is not present in this case.

Plaintiff argues that because Aetna approved her claim for benefits under the "any occupation" standard on a number of previous occasions, it cannot now change its mind without evidence of improvement in her condition.  "[T]he previous payment of benefits is just one 'circumstance,' i.e., factor, to be considered in the court's review process; it does not create a presumptive burden for the plan to overcome."  *Leger v. Trib. Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 832 (7th Cir. 2009).  Proof of improvement in condition is not necessarily required for the Disability Plan to change its mind as to Plaintiff's disability status.  *Holmstrom*, 615 F.3d at 737.  Accordingly, although Aetna's previous granting of benefits may be factored into the overall calculus, it does not conclusively establish that Aetna's termination of benefits was arbitrary and capricious.

Plaintiff's contends that Aetna did not accord proper weight to the opinions of Dr.

24

Arbuck, her primary treating physician.  Under ERISA, treating physicians' opinions are not entitled to more weight or deference than the opinions of physicians hired by the plan administrator.  *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833–34 (2003).  While plan administrators may not "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of treating physicians," *id.* at 834, departure from the treating physicians' opinions is permitted as long as a non-arbitrary explanation based on the evidence is provided for the departure.  *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 321–22 (7th Cir. 2007).  In this case, Aetna's record reviewing physicians repeatedly departed from Dr. Arbuck's opinions, both as to Plaintiff's disability status and limitations if she were to return to work.  In 2003, Dr. Arbuck stated that Plaintiff was capable of sedentary work.  R. 2215–16.  Following that, with the exception of the purported statement to Dr. Riso, Dr. Arbuck has consistently opined that Plaintiff is disabled due to her back pain and side effects from necessary medications.  *See, e.g.,* R. 387, 586, 643–44, 667, 683, 694, 2215–16.  Dr. Arbuck has further stated that Plaintiff's condition allows "no more than 4 hours a day [at a] sedentary job allowing frequent breaks."  R. 694.

However, the record reviewing physicians, while acknowledging Plaintiff's complaints of pain, are correct in noting that Dr. Arbuck's records do not include any testing underlying Dr. Arbuck's conclusions.  *See* R. 275, 277, 290–91.  The Court notes that in cases where the claimant's disability is premised on subjective pain, the Seventh Circuit has "rejected as arbitrary a[] . . . requirement that a claimant prove her condition with objective data where no definitive objective test exists for the condition or its severity."  *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 646 (7th Cir. 2009).  However, although pain itself may be subjective and not subject to objective testing, there is no doubt that limitations on

25

functional capacity resulting from pain can be tested. *See Holmstrom*, 615 F.3d at 770 (citing *Williams*, 509 F.3d at 322). Dr. Arbuck provided no objective test results or documentation for any limits to Plaintiff's functional capacity, and the only functional capacity assessment in the claim file suggests that Plaintiff is capable of sedentary work with minor restrictions on carrying more than fifteen pounds. R. 372. Additionally, the claim file includes evidence that Plaintiff was recovering well from her 2004 surgery and that side effects from her medications were controlled. *See* R. 559, 687. In short, Aetna's divergence from Dr. Arbuck's opinion as to Plaintiff's disability status and limitations was based on evidence in the record and, therefore, not arbitrary and capricious.

Reviewing all the evidence of Aetna's processing of Plaintiff's claim, the Court concludes that Aetna did not act arbitrarily and capriciously in administering her claim. The Disability Plan gives Aetna discretion to decide what proof is sufficient to document a disability, *see* R. 1184, and Aetna informed Plaintiff of the documents needed to document her disability, including test results for both the existence of a disability and functional limitations caused by that disability. *See* R. 176–77; *cf. Majeski*, 590 F.3d at 484 (requiring a plan administrator to communicate specific reasons for denial). Although the August 2009 termination was based on Dr. Riso's purported conversation with Dr. Arbuck, which Dr. Arbuck clarified was not intended to communicate an ability to engage in full time employment of any kind, the appeal was based upon a review of the entire claim file. R. 80, 176–77, 694. Throughout the appeal process, Aetna gave Plaintiff a number of opportunities to supplement the claim file with relevant documentation, and Plaintiff repeatedly declined to do so. *See, e.g.*, R. 64, 68. Aetna engaged multiple medical experts to evaluate Plaintiff's claim file under the "any occupation" standard, and four

26

different experts concluded based on reasonable evidence in the claim file that Plaintiff is capable of sedentary work, rendering her not disabled under the Disability Plan.  *See* R. 273–91.  Under the deferential standard that must be applied in this case, the Court cannot conclude that Aetna abused its discretion in relying on the reports of its record reviewing physicians to terminate Plaintiff's benefits.  Therefore, the Disability Defendants are entitled to summary judgment.

## C.  TERMINATION OF MEDICAL PLAN BENEFITS

The parties all agree that Plaintiff is entitled to reinstatement of coverage under the Medical Plan only if the Court finds that the Disability Defendants arbitrarily and capriciously terminated her benefits under the Disability Plan.  *See* dkt. no. 72.  Because the Court concludes that Plaintiff was not arbitrarily and capriciously terminated from the Disability Plan, she is not entitled to reinstatement under the Medical Plan or reimbursement for COBRA coverage.  The Medical Plan is entitled to summary judgment.

## IV.  CONCLUSION

For the reasons set forth herein, the Court rules as follows:

1)      Defendant AstraZeneca Retiree Health Plan's Motion for Summary Judgment [Dkt. No. 55] is **GRANTED**.

2)      Plaintiff Carol Aschermann's Motion for Summary Judgment [Dkt. No. 57] is **DENIED**.

3)      Defendants Aetna Life Insurance Company, Lumbermens Mutual Casualty Company, and AstraZeneca Long Term Disability Insurance Plan's Motion for Summary Judgment [Dkt. No. 61] is **GRANTED**.

4)      Plaintiff's Request for Oral Argument [Dkt. No. 60] is **DENIED**.

Judgment shall issue accordingly.

IT IS SO ORDERED this 30th day of December, 2011.


LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution attached.

Distribution to:

William Robert Brown
SCHUCKIT & ASSOCIATES, P.C.
wbrown@schuckitlaw.com

Mathew D. Dudek
MECKLER BULGER TILSON MARICK & PEARSON LLP
Suite 1800
123 N. Wacker Drive
Chicago, IL 60606

Eric P. Mathisen
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
eric.mathisen@ogletreedeakins.com

Bridget L. O'Ryan
O'RYAN LAW FIRM
boryan@oryanlawfirm.com

Peter  Petrakis
MECKLER BULGER & TILSON LLP
peter.petrakis@mbtlaw.com

Mark E. Schmidtke
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
mark.schmidtke@ogletreedeakins.com

Rachel S. Urquhart
MECKLER BULGER & TILSON LLP
rachel.urquhart@mbtlaw.com

Amanda Lynn Yonally
O'RYAN LAW FIRM
ayonally@oryanlawfirm.com